**[J-59A-2013] [MO: Castille, C.J.]**

# IN THE SUPREME COURT OF PENNSYLVANIA
## MIDDLE DISTRICT

IN RE:  MAGISTERIAL DISTRICT      : No. 84 MM 2013
JUDGE MARK A. BRUNO, MAGISTERIAL : 
DISTRICT 15-1-01                   : Petition to Vacate the Order of the
                                           : Supreme Court dated February 1, 2013
                                           :
PETITION OF:  MARK A. BRUNO     : ARGUED:  September 10, 2013

## CONCURRING OPINION

                                        **DECIDED:  August 28, 2014**
**MR. JUSTICE McCAFFERY**             **OPINION FILED:  October 1, 2014**

      I concur in the result reached by the majority that both this Court and the Court of Judicial Discipline ("CJD") have constitutional authority to order sanction of a jurist, although this Court should reserve the exercise of that authority for truly extraordinary circumstances.  I further agree that, in the event that incompatible orders are filed by this Court and the CJD, the order of this Court takes precedence.  In my view, this result follows directly from the plain text of the relevant constitutional provisions regarding this Court, the Judicial Conduct Board ("Board") and the CJD, as well as the well-established understanding of the broad scope of this Court's King's Bench authority, as set forth in this Court's precedential decisions.

      As an initial matter, I note that members of the judiciary are vulnerable to accusations of wrongdoing by disaffected litigants that are grounded in nothing more than dissatisfaction with the resolution of a case.  In particular, those judges who serve on the front-line trial courts are open to false accusations by vindictive litigants, given the large number of cases adjudicated in this Commonwealth and the ease with which a complaint may be lodged with various investigative authorities.  With this vulnerability in mind, I

would urge extreme caution in the imposition of the sanction of suspension without pay for an accused jurist. Such a sanction carries the potential for severe, irreparable economic harm to the jurist, even if he or she is subsequently vindicated by the investigatory authority or in a criminal proceeding. For this reason, I favor as the norm the process set forth in the Pennsylvania Constitution by which a full investigation of any alleged judicial misconduct takes place. The Judicial Conduct Board is the body invested by the Pennsylvania Constitution with the specific authority to appoint a staff and

> receive and investigate complaints regarding judicial conduct filed by individuals or initiated by the board; issue subpoenas to compel testimony under oath of witnesses, including the subject of the investigation, and to compel the production of documents, books, accounts and other records relevant to the investigation; determine whether there is probable cause to file formal charges against a justice, judge or justice of the peace for conduct proscribed by this section; and present the case in support of the charges before the Court of Judicial Discipline.

Pa.Con., Art. V, § 18(a)(7).

Therefore, while I agree that this Court and the CJD each has the authority to order sanction of a jurist, I also fully support the conclusion that it is only in truly extraordinary circumstances that this Court should exercise its authority. I believe that these conclusions do not constitute a departure from this Court's jurisprudence, but rather are firmly supported by the historical context and precedential decisions discussed in the majority opinion, and more succinctly below.

In this Court is "reposed the supreme judicial power of the Commonwealth," and as part of the supreme judicial power, this Court is required to "exercise general supervisory and administrative authority over all the courts" in the Commonwealth. Pa. Con., Art. V, §§ 2 and 10(a), respectively. As we have explained, authority over the lower courts was

vested in this Court from its very creation, as a part of the conferral of King's Bench powers to this Court under the Act of May 22, 1722, 1 Sm.L. 131, Section XIII.  See In re Franciscus, 369 A.2d 1190, 1192 (Pa. 1977); Commonwealth v. Onda, 103 A.2d 90, 91 (Pa. 1954).   The King's Bench power to supervise lower courts is not only longstanding, but also broad and extensive:   "Inherent in the Court of King's Bench was the power of general superintendency over inferior tribunals, a power which was of ancient inception and recognized by the common law from its very beginnings.   … The power of controlling the action of inferior courts is so general and comprehensive that it has never been limited by prescribed forms of procedure… ."   Franciscus, supra at 1192-93 (quoting Carpentertown Coal & Coke Co. v. Laird, 61 A.2d 426, 428-29 (Pa. 1948)).   The 1968 amendments to the Pennsylvania Constitution included a reiteration of the authority of this Court to exercise King's Bench and other powers.   See Pa. Const. Sched. Art.V, § 1 ("The Supreme Court shall exercise all the powers … now vested in the present Supreme Court… ."); see also In re Avellino, 690 A.2d 1138, 1140 (Pa. 1997); 42 Pa.C.S. § 502.

In Franciscus, supra at 1191, this Court relied on its constitutionally derived supervisory authority to suspend a justice of the peace from his office following his federal indictment related to his official duties.   Contending that this Court had overstepped its authority, the jurist argued that he could only be suspended pursuant to a recommendation by the then-extant Judicial Inquiry and Review Board, which, pursuant to the 1968 version of Art. V, § 18 of the Pennsylvania Constitution, was granted the power to investigate possible judicial impropriety.   This Court rejected the jurist's view. We recognized that the 1968 version of Art. V, § 18 established a procedure by which jurists may be removed or subjected to disciplinary proceedings, but we concluded that the establishment of that procedure did not in any sense "revoke or diminish the inherent

authority of this Court to exercise its superintendency powers over the lower judiciary."
Franciscus, supra at 1191-92 (citing Pa. Con. Art. V, §§ 1 and 10(a))

Thus, Franciscus stands for the proposition that, as part of its supervisory power over the lower judiciary, this Court has the authority to suspend a jurist indicted for criminal activity. We explained that the Court's suspension of the jurist was not meted out as a form of punishment, but rather was necessary to ensure not just the fact, but also the appearance of fairness and probity in the judiciary.

> We are constrained to exercise our powers of supervision under the circumstances present here in order to guard and protect the just rights and independence of the bar, the dignity and authority of the court, and the safety and protection of the public.

Id. at 1195 (internal quotation marks and citation omitted).

In 1993, Art. V, § 18 of the Pennsylvania Constitution was extensively amended to create a Judicial Conduct Board to "receive and investigate complaints regarding judicial conduct filed by individuals or initiated by the board," and a Court of Judicial Discipline which, upon the filing of formal charges by the Board, was to "promptly schedule a hearing or hearings to determine whether a sanction should be imposed" against a jurist. Pa. Con., Art. V, § 18(a)(7) and (b)(5).

Four years later, in In re Avellino, 690 A.2d 1138 (Pa. 1997) ("Avellino I"), this Court considered the effect of the 1993 amendments to Art. V, § 18 on our supervisory authority over all courts, as set forth in Art. V, § 10(a). Avellino, then a judge in the court of common pleas, had refused to comply with his assignment to preside over certain criminal trials. We directed him to show cause why he should not comply with the assignment and ordered him to comply. Avellino I, supra at 1139. Avellino argued that we had no jurisdiction in the dispute because the 1993 amendments to Art. V, § 18 "manifest an intent to limit [this Court's] authority to impose discipline *de novo*." Avellino

I, <u>supra</u> at 1143. We rejected this argument, citing our holding in <u>Franciscus</u>, and explaining as follows:

> The 1993 amendments [ ] altered the mechanism for investigating and adjudicating charges of judicial misconduct by abolishing the Judicial Inquiry and Review Board and creating the Judicial Conduct Board and the Court of Judicial Discipline. Given our clear holding sixteen years earlier in <u>Franciscus</u> that our supervisory power was neither revoked nor diminished by Section 18, had the people intended to revoke or diminish that power in amending Section 18[,] the amendment would have explicitly so provided. Nowhere in the amended Section is such an intention expressed or even implied.

<u>Avellino I</u>, <u>supra</u> at 1143 (footnote omitted).

Furthermore, we made expressly clear that if this Court's supervisory authority is to be effective, then, under circumstances such as those presented in <u>Avellino I</u>, it is necessary for the Court to be able to consider the imposition of sanctions. <u>Id.</u> at 1144. We expanded on this concept in <u>In re Avellino</u>, 690 A.2d 1144 (Pa. 1997) ("<u>Avellino II</u>"), wherein Avellino argued that, while this Court's power to supervise the lower courts permitted the imposition of *remedial* measures, it did not permit the imposition of *punitive* measures, as the latter were exclusively within the authority of the CJD. We rejected this argument, concluding that Avellino's actions "unquestionably undermined the public perception of the judiciary … [and his] refusal to comply with an assignment of an administrative judge, [and] to obey an order of this Court, is in complete derogation of respect for the law and the integrity of the judiciary." <u>Avellino II</u>, <u>supra</u> at 1145.

Accordingly, we ordered the suspension of Avellino for a period of three months without pay. Id. at 1146.[1]

Here, Petitioners make essentially the same arguments that we rejected in Avellino I, Avellino II, and Franciscus. I believe those precedents were correctly decided and form a solid grounding for our decision here. Specifically, under the holdings of Avellino I, Avellino II, and Franciscus, there is no merit to Petitioners' assertion that this Court's historic and constitutionally derived supervisory and administrative authority over the lower courts was curtailed by the 1993 amendments to Art. V, § 18 in such manner as to eliminate any disciplinary authority.[2]

Looking to the specifics of Judge Bruno's case and mindful of the need of this Court to exercise extreme caution in ordering a jurist's suspension from service without pay, I believe that this Court acted properly in its July 11, 2013 order directing the recommencement of payment of Judge Bruno's salary pending final disposition of the matter. Our order entered August 28, 2014, vacating the February 1, 2013 order, after

---

[1] A factual situation similar to Avellino was presented to this Court in In re: McFalls, 795 A.2d 367 (Pa. 2002). McFalls, also a judge in the court of common pleas, failed to comply with his judicial assignments, resulting in this Court's order directing him to show cause for his failure to comply and as to why he should not be subject to interim suspension. While McFalls did not dispute the authority of this Court to take such action, he did argue that it would be preferable for this Court to decline to act and defer to the Judicial Conduct Board. We rejected McFalls's position, imposed a thirty-day suspension without pay as a "proper response" to his defiance, and referred the matter to the Judicial Conduct Board.

[2] Petitioners attempt to distinguish the facts of the instant cases from our precedents, arguing that Franciscus and Avellino I and Avellino II were supervisory or administrative matters and the instant case is a disciplinary matter. These arguments are unconvincing, and would lead to endless haggling in future cases as to whether the issue presented was supervisory/administrative or disciplinary. Furthermore, Petitioners seem to ignore the fact that this Court imposed suspensions on both jurists in Franciscus and Avellino II.

Judge Bruno's outright acquittal of all federal charges, clears the way for Judge Bruno to resume his place on the bench of Chester County.

Finally, I observe that our retention of King's Bench jurisdiction over the supervision of jurists does not guarantee that this Court will always recognize when there are truly extraordinary circumstances that present the need for immediate action to ensure the administration of justice. Specifically, my appraisal of this Court's response time to the Luzerne County crisis and our reaction to the conduct of then-Judges Ciavarella and Conahan differs from that of the majority.

An application for the exercise of King's Bench power was filed on April 29, 2008, by the Juvenile Law Center on behalf of Luzerne County juveniles involved in delinquency proceedings who were unrepresented by counsel. In re J.V.R., No. 81 MM 2008. The application alleged that these juveniles had been improperly denied their right to counsel and, as a consequence, had been unjustly sent to out-of-home placements. It is this application that first "called into question the legitimacy of adjudications of delinquency and other dispositions," not the subsequent criminal indictments. See Majority Opinion at 56. Within two weeks of the April 2008 application, briefs were filed by the Pennsylvania Department of Public Welfare and the Office of the Attorney General in support of the application for the exercise of King's Bench jurisdiction.[3]

The Department of Public Welfare described the disparity between the rate at which juveniles were unrepresented by counsel in Luzerne County and that of other counties in Pennsylvania as "so dramatic as to require an inference of a systematic deprivation of the constitutional rights of accused juveniles by the Luzerne County Court of Common Pleas." Brief of Department of Public Welfare at 3, In re J.V.R., No. 81 MM

---

[3] By the end of May 2008, Luzerne County and Judge Ciavarella had filed briefs in opposition to the application.

2008, filed May 12, 2008. The Attorney General urged this Court to consider the allegations because they raised "serious questions about the fairness and integrity of juvenile proceedings in Luzerne County." Brief of Office of the Attorney General at 3, In re J.V.R., No. 81 MM 2008, filed May 15, 2008. Thus, "we **could have** perceived" from these pleadings "the criminal conduct in Luzerne County," which potential criminal misconduct was not "**only made apparent** by the filing of federal charges." See Majority Opinion at 59 n.21 (emphases supplied).

Despite the gravity of the allegations and the support of the Commonwealth's chief legal and law enforcement officer, this Court took no action until January 8, 2009, when it entered an order **denying** the application for the exercise of King's Bench power. On January 30, 2009, the Juvenile Law Center filed a motion for reconsideration based upon the federal indictments of Judges Ciavarella and Conahan on January 26, 2009. On February 2nd, this Court vacated its January 8th order, pursuant to its constitutional authority under Article V § 10 (general supervisory and administrative authority) and statutory authority under 42 Pa.C.S. § 502 (King's Bench). Finally, on February 11, 2009, some nine months after the first application for the exercise of King's Bench power had been filed, this Court exercised plenary jurisdiction over the matter "in light of the recent revelation of federal criminal charges and pending guilty plea agreements" of Judges Ciavarella and Conahan, and appointed a special master. In re J.V.R., No. 81 MM 2008, Order dated 2/11/09. That is, only upon the issuance of federal indictments was this Court moved to exercise its "flexible and transcendent" authority. Majority Opinion at 56, 61. This chronology causes me to conclude that this Court did not "innovate a swift process" addressing the allegations of denial of the right to counsel and the improper imposition of out-of-home placements. Majority Opinion at 59, 56, 61. Notwithstanding our slow response to the crisis in Luzerne County, ultimately this Court

properly exercised its King's Bench power in response to the presentation of truly extraordinary circumstances, addressed the need to restore propriety to the administration of juvenile justice in Luzerne County, and effected a wide range of remedies to do so.